IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

| | | |
|---|---|---|
| COREY V. ARMSTRONG, #265924 | * | |
|     Plaintiff | * | |
| vs. | * | CIVIL NO.: WDQ-08-0342 |
| | * | |
| KATHLEEN GREEN, et al. | * | |
|     Defendants. | * | |
| | *** | |

MEMORANDUM

Corey Armstrong sued Kathleen Green, Warden of Eastern Correctional Institution ("ECI"), and others ("the Defendants") for violating his First, Eighth, and Fourteenth Amendment rights. Pending is the Defendants' supplemental motion to dismiss or for summary judgment.[1] No hearing is necessary.[2] Local Rule 105.6 (D. Md. 2010). For the following reasons, the Defendants' motion will be granted.

I.    Background[3]

Armstrong is an inmate at Northern Branch Correctional Institution ("NBCI"), a maximum security facility in Cumberland, Maryland. ECF No. 1 at 3-8. Previously, he was an inmate at ECI.

---

[1] Armstrong also filed a motion to strike the Defendants' filing under seal the confidential settlement agreement in *Cabana v. Warden., et al.*, Civil Action No. JFM-07-2205 (D. Md.). ECF No. 56. Because the need to maintain confidentiality outweighs the relevancy of the settlement to this case, Armstrong's motion to strike will be denied.

[2] The Defendants' first motion to dismiss or for summary judgment and Armstrong's cross-motion for summary judgment were denied without prejudice on March 5, 2009. The case was stayed pending resolution of *Cabana v. Warden*. ECF No. 43. On March 30, 2010, the stay was lifted and the parties were granted additional time to file supplemental responsive pleadings. ECF No. 52. The Court has considered the pleadings.

[3] In reviewing the motion for summary judgment, Armstrong's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

ECF No. 1 at 3.

On July 31, 2007, Armstrong was removed from ECI's general population and placed on administrative segregation, without a hearing. *Id.* He was provided with a notice of assignment, stating "[y]ou will be seen by the case management team within five days of your placement on administrative segregation. . . [a]n investigation is pending in your case." ECF No. 21, Ex. 1 at 39. Prison officials believed that Armstrong was heavily involved in gang activity, including gambling, drugs, and participation in an unauthorized prison store. *Id.* at 39-40. On August 2, 2007, Armstrong attended a case management review to discuss the basis for his administrative segregation. ECF No. 41, Ex. 2 at ¶ 5. He was allowed to challenge his assignment. *Id.*

On August 6, 2007, prison staff confiscated several letters from Armstrong, in which he ordered "hits" on inmates who had lied to him. ECF No. 21, Ex. 1 at 41. On August 7, 2007, an ECI intelligence officer requested that Armstrong's security level be increased to maximum because he: (1) was serving a 40-year term for second-degree murder and had a mandatory release date of 2031, (2) had a 37-page adjustment history including many acts of violence, (3) was a leader of the Black Gorilla Family ("BGF"), and (4) was a drug runner at ECI, whose name had "surfaced with recent drug overdoses." ECF No. 21, Ex. 1 at 39-40. On August 24, 2007, Armstrong was transferred to NBCI. ECF No. 1 at 3.

On September 4, 2007, Armstrong attended a case management review before the NBCI classification and levels committee. ECF No. 41, Ex. 2 at ¶ 6.[4] He was identified as an influential gang member, placed in the Special Management Unit ("SMU"), and recommended for the Quality

---

[4] The committee included a chief psychologist, psychology associate, social worker, case manager, intelligence officer, housing unit sergeants, a housing unit manager, a correctional

2

of Life ("QOL") program. *Id.* at ¶ 6.[5] At the review, Armstrong was allowed to contest the basis for his placements. *Id.* He received a QOL evaluation, and was placed at the program's intake level. *Id.*, Ex. 3 at ¶ 4. Armstrong refused to sign his Behavioral Management Plan ("BMP") and was told he would remain on the intake level until he did. *Id.*

Armstrong attended another review October 2, 2007. After that, he declined to attend the monthly review sessions. ECF No. 21, Ex. 1 at 9-16. Because of his refusal to participate in the QOL program, Armstrong remained at the intake level until April 2008, when the program was made voluntary and he opted-out. *Id.* at 17. At that time, he was placed on administrative segregation, where he remained until January 22, 2009. ECF No. 59, Ex. 5.

QOL intake level inmates were allowed: (1) two showers per week, (2) one day of recreation per week in a three-piece restraint, and (3) no visits except legal and clergy. ECF No. 21, Ex. 4 at 8. They also had restricted property privileges. *Id.* Inmates could not advance from the intake level until they gave a verbal commitment to participate in the program. *Id.* As initially implemented, QOL inmates who refused to participate in the program remained at the intake level indefinitely. *Id.*[6]

Armstrong asserts that his First, Eighth, and Fourteenth Amendment rights have been violated. He alleges that his removal from ECI's general population to administrative segregation

---

officer, and the program historian. ECF No. 21, Ex. 2 at 32.

[5] QOL was a behavioral management program for inmates deemed a security threat. ECF No. 21, Ex. 3 at 5.

[6] Participation in the program was mandatory until April 2008, at which time the QOL guidelines were revised, allowing inmates to opt-out of the program and be placed on administrative segregation instead. ECF No. 21, Ex. 5 at 2-3.

was without notice or hearing, as was his transfer to NBCI's SMU. ECF No. 1 at 3. He alleges that he was only told that his SMU and QOL placements were based on his involvement in "security threat activity behavior," and that this finding was based on "security confidential" information. *Id.* He states that his property was confiscated and all his privileges revoked upon transfer to NBCI. *Id.* at 6. He asserts that he was: (1) placed on 24 hour cell restriction, (2) allowed only one hour of recreation a week in leg irons, handcuffs, a security box, and waist chain, and (3) had his shower privileges curtailed for not participating in the QOL program, talking to other inmates, and "fishing a kite."[7] *Id.* at 6-8.

The Defendants contend that Armstrong was told the basis for his placements and given an opportunity to respond at the September 4, 2007 and October 2, 2007 reviews. ECF No. 21 at 5,8. They admit that the SMU and QOL placement processes were not clear, and that several inmates were erroneously assigned to the QOL program.[8] They state that no inmate was required to participate in the QOL program, but concede that inmates who refused to participate remained at the intake level until the program was made voluntary in April 2008. ECF No. 21 at 6-9.

II.     Analysis

---

[7] Fishing a kite refers to passing legal work by string among cells.

[8] Before an inmate was transferred to NBCI's SMU, the transferring institution was required to complete a placement form, which was approved by the regional assistant commissioner and the assistant commissioner for programming. ECF No. 21, Ex. 2 at 5. This process was not followed for approximately 90 inmates transferred to NBCI's SMU on an emergency basis in 2007. *Id.* Forty-two of those inmates were discharged from the SMU and QOL program when NBCI officials determined their placement was unsupported by proper documentation. *Id.*

4

A.     Standard of Review

Under Fed. R. of Civ. P. 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (emphasis in original).

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002), but the Court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003)(quoting *Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993)).

B.     Mootness

The Defendants argue that Armstrong's claims are moot because he is no longer assigned to administrative segregation or the QOL program. ECF No. 64. Armstrong argues that his claim is not moot because he seeks punitive and compensatory damages. ECF No. 26 at 20; ECF No. 66.

An actual controversy must exist throughout a case's pendency. *See Steffel v. Thompson*,

415 U. S. 452, 459 n.10 (1974). The parties must continue to have a "personal stake in the outcome" of the lawsuit, *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 478 (*quoting Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983)), meaning that throughout the litigation, the plaintiff 'must . . . suffer[], or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.' " *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Nakell v. Attorney General of North Carolina*, 15 F.3d 319, 322 (4th Cir. 1994) (quoting *Lewis,* 494 U.S. at 477).

Events occurring after a complaint is filed may moot a request for injunctive relief. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). When "on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that the mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues [are] obtained." *Lewis,* 494 U.S. at 480. Armstrong's request for injunctive relief was mooted when he was returned to the general population. *See Calderon,* 518 U.S. at 150. However, his claim for damages was not. *See Williams,* 952 F.2d at 823 (prisoner's Eighth Amendment claim for monetary damages not mooted by transfer to facility with superior conditions). An actual controversy still exists for this Court to decide.

      C.    Defendants' Motion for Summary Judgment

          1.    Fourteenth Amendment Due Process Claims

              a.    Administrative Segregation Assignment

Armstrong argues that his Fourteenth Amendment due process rights were violated

because he was placed on administrative segregation at ECI without notice or a hearing. ECF No. 1 at 3. The Fourteenth Amendment protects against deprivations of "life, liberty, or property." U.S. Const. amend. XIV. To determine whether a plaintiff has been deprived of due process, courts ask two questions: (1) whether the state has interfered with a protected interest? and (2) whether sufficient process accompanied that interference? *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005).

Prisoner's have a liberty interest in avoiding confinement that imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 484 (1995). Placement on administrative segregation alone is not an "atypical and significant hardship." *See Beverati v. Smith,* 120 F.3d 500, 502-04 (4th Cir. 1997) ("confinement to administrative segregation does not implicate a liberty interest."). Armstrong has not asserted, nor provided any evidence that his administrative segregation at ECI was atypical; Armstrong had no liberty interest in avoiding that confinement and his placement at ECI did not violate the Fourteenth Amendment.[9] The Defendants are entitled to summary judgment on this claim.

      b.  SMU Assignment

Armstrong also argues that his placement in NBCI's SMU and QOL program violated due process. He argues that the SMU and QOL programs were "atypical" as compared to other types of segregation because: (1) he was allowed no visitors and only an hour of recreation a

---

[9] Armstrong also had no liberty interest in avoiding transfer from ECI to NBCI. *See Olim v. Wakinekona,* 461 U.S. 238, 245-46 (1983)("an inmate has no justifiable expectation that he will

7

week in full restraints, (2) his shower privileges were revoked for communicating with other inmates, and (3) his placement at the intake-level was potentially indefinite.[10] ECF No. 1. He contends that he "was not given prior written notice" nor provided "a hearing by an impartial hearing officer" before his placement. *Id.*

Assuming, without deciding, that this shows a protected liberty interest,[11] the second consideration is whether sufficient process accompanied Armstrong's SMU and QOL placements. Three factors are considered in deciding whether the procedures used were sufficient: (1) the nature of the private interest affected, (2) the risk of erroneous deprivation through the procedures used, and the probable value, if any, of additional procedural safeguards, and (3) the Government's interest, including the function involved and the fiscal and administrative burdens of additional or substitute procedural requirements. *Wilkinson,* 545 U.S. at 224-25 (*citing Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)).

As to the first factor, Armstrong's interests "must be evaluated . . . within the context of the prison system and its attendant curtailment of liberties." *Id.* at 225. Prisoners are not

---

be incarcerated in any particular prison.").

[10] In his opposition to the Defendants' motion, Armstrong also argues that the placement made him ineligible for parole. ECF No. 26 7-8. No evidence supports this assertion.

[11] *See Wilkinson,* 545 U.S. at 244 (conditions in maximum security prison were atypical and significant when: (1) inmates lived in solitary confinement, (2) were exposed to light 24 hours a day, (3) were limited to one hour of daily indoor exercise, (4) the potential duration of placement was indefinite, and (5) the placement disqualified inmates for parole consideration); *Farmer v. Kavanaugh,* 494 F. Supp. 2d 345, 356 (D. Md. 2007) ("the conclusion in *Wilkinson* that general conditions of solitary confinement, along with lack of time limits on placement and categorical ineligibility for parole, give rise to a protected liberty interest does not mean that essentially the same conditions accompanied by a lack of time limits . . . and . . . adverse impacts on parole eligibility . . . do not establish [a protected] interest.").

entitled to the process due persons at liberty. Rather, "[p]risoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Id.* (*citing Gerstein v. Pugh,* 420 U.S. 103 (1975)). Armstrong was not entitled to an adversarial hearing, witnesses, evidence introduction, or other features of a full trial to support his placement.

The second factor addresses the risk that Armstrong was erroneously assigned to the SMU and QOL program under the procedures used, and the probable value of any additional procedures. Notice and an opportunity to rebut the basis for his placement are "the most important procedural mechanisms for purposes of avoiding [an] erroneous deprivation[]." *Id.* at 225-26. The undisputed evidence is that Armstrong was a BGF member and drug runner, ordered hits on other inmates, threatened prison officials, and had several institutional infractions. ECF No. 59.[12] Armstrong received notice and an opportunity to rebut the basis for his placement at the September 4, 2007 and October 2, 2007 reviews. ECF No. 41, Ex. 2 at ¶¶ 6-7. He declined to attend his monthly reviews thereafter. ECF No. 21, Ex. 2 at 9-16.

The notice of assignment, initial September 4, 2007 placement review, and the monthly reviews—which Armstrong could have attended to be heard—were sufficient to protect him from erroneous placement. *See Wilkinson,* 545 U.S. 216-17 (due process satisfied when inmates (1) were given brief factual basis for placement before initial hearing, (2) had opportunity to be heard at placement hearing and annual placement review, and (3) could appeal decisions).

Under the third factor, any additional steps Department of Corrections ("DOC") officials

9

could have taken to prevent an erroneous initial placement are outweighed by their obligation "to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson,* 545 U.S. at 227. The undisputed evidence is that the QOL program began in early 2007 in response to several incidents of gang violence at DOC facilities. ECF No. 26, Ex. 2 at 5-6. Inmates were transferred into the program on an emergency basis. *Id.* Several inmates were processed out of the program when NBCI officials discovered their placements were not sufficiently supported; Armstrong was not processed out because the basis for his placement was supported by documentation of gang involvement. ECF No. 59, Ex. 5.

There is no genuine dispute whether Armstrong was afforded adequate process for his SMU and QOL placements. The Defendants' motion for summary judgment will be granted on this claim.

2. Fourteenth Amendment Equal Protection Claim

Armstrong argues that his Fourteenth Amendment right to equal protection was violated because he was treated differently than NBCI's administrative segregation inmates. ECF No. 1 at 5. He states that he was deprived of "visits, phone, class, commissary property, [and] recreation [privileges]," which NBCI's administrative segregation inmates enjoyed. *Id.*

"The Equal Protection Clause generally requires the government to treat similarly situated people alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). To show that his equal protection rights were violated, Armstrong must demonstrate that: (1) he was treated differently than similarly situated inmates, and (2) the discrimination was intentional or purposeful. *Williams v. Bitner,* 307 Fed. Appx. 609, 611 (3d Cir. 2009); *Brooks v.*

---

[12] Because of its sensitive nature, the Defendants filed this evidence under seal. ECF No. 52.

*Berkebile,* 2010 WL 3521581, at *5 (S.D. W. Va. Aug. 16, 2010). If the discrimination was based on Armstrong's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling governmental interest; otherwise, Armstrong must show that the discrimination did not bear a rational relationship to a legitimate government purpose. *See Cleburne,* 473 U.S. at 440-42.

Viewing the facts in the light most favorable to Armstrong, he presents no genuine dispute whether the denial of his privileges violated equal protection. *Dennis,* 290 F.3d at 645. Armstrong has presented no evidence that his SMU and QOL placements were based on a suspect classification. Rather, the undisputed evidence is that he was placed in the program because his gang involvement made him a security threat. ECF No. 52. The program was designed to "provide safety and security to the staff and inmates throughout the Division of Corrections" and to "reduce risky behavior." ECF No. 21, Ex. 3 at 5. This is a legitimate government purpose. *See Overton v. Bazzetta,* 539 U.S. 126, 133 (2003) ("internal [prison] security [is] perhaps the most legitimate of penological goals."). Curtailment of visitation, recreation, and property privileges, which emphasizes the connection between an inmate's "choices and consequences," is rationally related to providing a safer prison environment. ECF No. 21, Ex. 3 at 8; *See Overton,* 539 U.S. at 133. The Defendants are entitled to summary judgment on Armstrong's equal protection claim.

        3.        Eighth Amendment Claim

Armstrong argues that his Eighth Amendment right against cruel and unusual punishment was violated because (1) his recreation was limited to one-day per week in restraints that "cut into [his] wrist and ankles," and (2) he has "only been allowed out of his cell to shower

approximately 20 times" since arriving at NBCI. ECF No. 1 at 5-6.

"[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters,* 989 F.2d 1375, 1381 (4th Cir. 1993). Armstrong presents no evidence that his restricted recreation and shower privileges caused a serious or significant injury. *See Williams v. Mathena,* 2010 WL 4226126 (W.D. Va. Oct. 25, 2010) (cuts and bruises caused by ankle chain were not serious injury). Summary judgment will be granted for the Defendants on this claim.

    4.    First Amendment Claim

Armstrong alleges that he did not advance from the QOL program's intake level "as a consequence for not speaking" and because he "refused to think and believe in a manner the program [required]." ECF No. 1 at 7. He contends that this violated his First Amendment right to free speech. *Id.*

The First Amendment protects "the right to refrain from speaking at all." *Wooley v. Maynard,* 430 U.S. 705, 714 (1977). However, it is well "recognized that conviction of a crime carries with it the necessary curtailment of rights of a convict." *Folk v. Attorney General,* 425 F. Supp. 2d 663, 673 (W.D. Pa. 2006). An inmate does not retain those First Amendment rights that are "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Thus, to show a violation of his First Amendment rights, an inmate must demonstrate that the restriction "serve[d] no legitimate penological goal and/or [was] not reasonably related to rehabilitation." *Folk,* 425 F. Supp. 2d at 673.

12

The undisputed evidence is that the QOL program was intended to "reduce risky behavior" of inmates "deemed to be a security threat to the good order of [the institution]," and to facilitate their "ultimate[] . . . return to a less restrictive environment." ECF No. 21, Ex. 3 at 5. Inmates were required to "give a verbal commitment to participate in the program" and "[d]emonstrate [r]espectful, appropriate behavior" to progress through the levels. *Id.* at 8. Armstrong was placed in the QOL program because he was deemed to be an influential gang member. ECF No. 52.

Armstrong raises no genuine issue about the program's penological goal of "reduce[ing] risky behavior" and improving institutional safety or its reasonable relationship to his rehabilitation. *See Folk*, 425 F. Supp. 2d at 673-74 (dismissing prisoner's First Amendment claim arising from required participation in rehabilitative programs). The Defendants are entitled to summary judgment on Armstrong's First Amendment claim.

III. Conclusion

For the reasons stated above, the Defendants' supplemental motion to dismiss or for summary judgment will be granted as to all claims.

December 16, 2010                                /s/
Date                                            William D. Quarles, Jr.
                                                  United States District Judge